UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | * | CIVIL ACTION NO. 23-1931 |
| OF TEXAS PETROLEUM | * | |
| INVESTMENT COMPANY AS OWNER | * | SECTION: "A"(3) |
| OF THE VESSEL LA 5580 FF AND | * | |
| VESSEL LA 5910 FN IN A CAUSE FOR | * | JUDGE JAY C. ZAINEY |
| EXONERATION FROM OR | * | |
| LIMITATION OF LIABILITY | * | MAGISTRATE JUDGE EVA J. DOSSIER |
| | * | |
| | * | |

## ORDER AND REASONS

The following motions are before the Court: **Motion for Summary Judgment (Rec. Doc. 41)** filed by Claimant, James Pierre, Jr.; **Motion for Summary Judgment (Rec. Doc. 35)**, filed by Petitioner, QBE International Markets and Texas Petroleum Investment Company ("TPIC"); and **Motion for Summary Judgment (Rec. Doc. 42)**, filed by Defendant, Clayton Wyatt Hall. Petitioner, TPIC, opposes Pierre's motion (Rec. Doc. 41). Pierre opposes each of TPIC's and Hall's motions (Rec. Docs. 35 and 42). The motions, submitted for consideration on August 7, 2024, are before the Court on the briefs without oral argument. For the reasons that follow, all three motions for summary judgment are **DENIED**.

### I.     Background

This case arises out of a collision of two vessels, both owned by TPIC, in the inland waters of Plaquemines Parish, Louisiana, on October 10, 2022. At the time of the accident, Pierre was an employee of Eagle Services, LLC ("Eagle"), serving as a contract hand for TPIC. (Rec. Docs. 35-6, 35-7). On the day of the accident, Clayton Hall, a TPIC employee, traveled to Well No. 23 to conduct maintenance work due to its malfunction. (Deposition of James Pierre, Jr.,

1

Rec. Doc. 35-5, 29:22-25).[1] Because Well No. 23 ran into the same pipeline as Well No. 64, Hall dispatched Pierre to stop the flow in Well No. 64. (*Id.* at 43:15-25). Once Pierre cut the flow, he was to remain there until instructed to reopen the flow. (*Id.* at 45:7-13). However, Pierre's phone battery died and, after waiting fifteen minutes, he boated back to Well No. 23 to wait with Hall. (*Id.* at 45:14-46:3). On his way back, Pierre turned into a canal as Hall boated in his direction and the two boats collided, injuring Pierre. (*Id.* at 56:7-9).

Following the collision and Pierre's injuries, Pierre filed suit in state court in Plaquemines Parish. In response, TPIC filed a Limitation of Liability proceeding in this Court on June 7, 2023 (Rec. Doc. 1). Pierre filed an answer and a claim in the limitation on September 6, 2023, and amended on March 8, 2024, adding two new parties. (Rec. Doc. 17). All parties have now separately moved for summary judgment. Pierre has moved for summary judgment on the basis that TPIC has no right to claim limitation of liability due to the Limitation of Liability Act's newest amendments, which, he argues, exclude this accident from the scope of the statute. TPIC has moved for summary judgment on the issue of the borrowed employee doctrine, which, if applicable, would cloak TPIC in tort immunity. Hall has, in essence, joined in this motion with his motion for summary judgment, asserting that co-employees are shielded under the borrowed employee doctrine. The Court first considers Pierre's motion because if the statute for limitation of liability does not apply, all other motions for summary judgment are moot.

II.     **Legal Standard**

Summary judgment is proper where there is "no genuine dispute of material fact" and "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). That is, it is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[1] All deposition citations refer to the page numbers of the depositions themselves, not to the page numbers in the CM/ECF headers.

2

the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones v. Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position. *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

### III. Discussion

#### 1. Applicability of the Limitation Statute

Pierre's motion for summary judgment relies on the Limitation of Liability Act's newest amendments, asserting that the vessels qualify as covered small passenger vessels and therefore

are excluded from the limitation of liability statute. The statute provides that it "applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats." 46 U.S.C. § 30502(a). However, under the amendments, the chapter does *not* apply to "covered small passenger vessels." *Id.* (b). A covered small passenger vessel has two definitions, only one of which applies here.[2] This definition states that covered vessel "means a small passenger vessel, as defined in section 2101, that is (i) not a wing-in ground craft; and (ii) carrying (I) not more than 49 passengers on an overnight domestic voyage; and (II) not more than 150 passengers on any voyage that is not an overnight domestic voyage. 46 U.S.C. § 30501(1)(A) (cleaned up). Pierre's motion stops at this point before providing a lengthy analysis of the retroactive application of the amendments. However, he fails to provide the definition for small passenger vessels as defined in section 2101.

A small passenger vessel is a wing-in-ground craft carrying at least one passenger for hire, and a vessel of less than 100 gross tons that is: (1) carrying more than six passengers, with at least one of those being a passenger for hire; (2) chartered with the crew provided and carrying more than six passengers; (3) chartered with no crew and carrying more than twelve passengers; (4) a submersible vessel carrying at least one passenger for hire; or (5) a ferry with more than six passengers. 46 U.S.C. § 2101(47). While TPIC provides the definition of "passenger" under the statute, this Court recognizes that the vessels at issue do not qualify under definitions (1), (2), (3), and (5), because neither vessel in the accident described carried more than one individual, regardless of whether they are "passengers" under the statute. Additionally, a "submersible vessel" is one "that is capable of operating below the surface of the water." 46 U.S.C. § 2101(49). There is no evidence that these boats are designed to operate under the water.

---

[2] The second covers wooden vessels. The vessels at issue are agreed to not have been constructed with wood.

Accordingly, the boats at issue do not qualify as small passenger vessels under any of the definitions.

Further, to the extent that either vessel is a wing-in-ground craft, the vessels still do not qualify under the definition, because it requires the vessel to be carrying a passenger for hire. A passenger for hire is "a passenger for whom consideration is contributed as a condition of carriage on the vessel." 46 U.S.C. § 2101(30). Pierre was not a passenger of his own vessel, as he was the master of the vessel, and the same is the case for Hall. 46 U.S.C. § 2101(29). Further, "the boats were never used to transport 'passengers for hire.'" (Affidavit of Tommy LeJeune, Rec. Doc. 48-1, at 2). Therefore, the exclusion does not cover the boats in this matter.

The boats at issue were an 18' aluminum skiff and a 24' work boat. (Rec. Doc. 48-2, at 1-2). Neither carried more than the boat's operator. The Court is satisfied that the statutory exclusion of small passenger vessels, effected by the amendments, does not cover the vessels at issue in this matter. Therefore, the Court need not conduct an analysis regarding the potential retroactive nature of the statute's amendments.

Accordingly, Pierre's motion for summary judgment is **DENIED**.

2. *Borrowed Employee Doctrine*

TPIC and Hall have moved for summary judgment, requesting that the Court find that they are each shielded from tort liability by the borrowed employee doctrine. If the borrowed employee doctrine applies, then Pierre would be covered under the Longshoremen and Harbor Workers' Compensation Act ("LHWCA"), which entitles the worker to receive worker's compensation for injuries sustained on the job. *See Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1243 (5th Cir. 1988). Because the LHWCA is the exclusive remedy for an employee, if an

5

individual is found to be a borrowed employee, then the employer is shielded by tort immunity. *Id.* at 1243-44 (citing 33 U.S.C. § 905(a)).

The Fifth Circuit has developed a series of factors used to determine whether an individual is a borrowed employee:

> (1) Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?
> (2) Whose work was being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?

*Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993) (citing *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 676 (5th Cir. 1993)). The Fifth Circuit has uniformly found that "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship." *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir. 1985) (quoting *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 321 (5th Cir. 1969)). "The factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship," but the Fifth Circuit has "nevertheless indicated, in different cases, that certain of these factors may be more important than others, at least in the light of the facts then before the court." *Id.* (quoting *Ruiz*, 413 F.2d at 321). Finally, while the application of this doctrine is a question of law, "in some cases, factual disputes must be resolved before the district court can make its legal determination."[3] *Billizon*, 993 F.2d at 105.

---

[3] While the Court notes that factual disputes may preclude summary judgment at times, in other cases, a factual dispute as to one or two of the factors may not necessarily preclude summary judgment. *See Billizon*, 993 F.2d at 105-06. The district court must determine whether the factual issues are significant enough to deny summary judgment.

A. Control

The first factor asks which company had control over Pierre and the work he was performing, "beyond mere suggestion of details or cooperation." *Id.* In support of its argument, TPIC states that Pierre "was exclusively supervised by TPIC personnel working in the Plaquemines Parish field and TPIC controlled all the details of his work." (Rec. Doc. 35-2, at 7). TPIC has provided two affidavits supporting its position. James Hendry's affidavit states that he, an operator for TPIC, would "oversee the activities of contract workers, such as James Pierre," and that such contract hands typically worked a seven-day hitch in TPIC's fields. (Rec. Doc. 35-7, at 1-2). Nick Lichenstein, a controller for Eagle, has also provided a sworn statement that "when Eagle payroll employees, such as James Pierre, Jr., are assigned to work for TPIC, once they are on the TPIC premises they are under the exclusive direction and control of TPIC personnel." (Rec. Doc. 35-6, at 2). Finally, Pierre's deposition suggests that he was under the direction of a TPIC individual during his hitches. Hall, "a foreman" (Deposition of James Pierre, Jr., at 9:19), appeared to instruct Pierre during these seven-day hitches. (*Id.* at 39:17-25, 43:12-44:5, 45:7-13 (Hall "called for us to go in the field," provided assignments)). Having reviewed this evidence, the Court is satisfied that TPIC has produced sufficient evidence to shift the burden to Pierre to contest the evidence provided in TPIC's favor.

In opposition, Pierre cites portions of the Master Services Agreement ("MSA") between Eagle and TPIC at length, including the independent contractor relationship provision and the requirement that Eagle insure Pierre, and argues that the MSA was never adequately modified.[4]

---

[4] The MSA specifically states that no change or modification shall be binding unless written and signed by both parties. (Rec. Doc. 35-6, at 17). Additionally, the contract states that Eagle "shall be deemed to be an independent contractor, with the authority and right to direct and control all the details of the work with [TPIC] being interested only in the results obtained." (*Id.* at 5). Further, the contract explicitly states that TPIC "shall have no right or authority to supervise or give instructions to the employees, agents, or representatives" of Eagle. (*Id.*).

7

He also contends that Hendry, who provided one of TPIC's affidavits, did not have personal experience with or personal knowledge of Pierre's employment, and that no evidence has been provided by any individual who directly supervised or controlled Pierre. Finally, he asserts that TPIC's Health and Safety Manager at the time of the accident memorialized that an Eagle employee was Pierre's supervisor, thus showing that Eagle had control over Pierre.

    The Court is unpersuaded by the argument that any provision of the contract directly impacts the "control" factor. Instead, those provisions apply to the third factor, as discussed later. Indeed, the Court has seen no case law from the Fifth Circuit suggesting that such provisions defeat a finding of actual control demonstrated by facts. *See Billizon*, 993 F.2d at 106 (finding that contractual provisions designed to defeat the borrowed employee doctrine affect the third factor). Additionally, the Court has been provided no evidence demonstrating that Eagle continued to exercise control over Pierre during his time at TPIC. Pierre's argument that the affidavits were provided by individuals without personal knowledge of Pierre or his work is not convincing. Although Hendry did not expressly state that he knew Pierre, he was intimately familiar with the Romere Pass Field, where Pierre was located, and would oversee the activities of contract workers. (Rec. Doc. 35-7, at 1). No evidence has been introduced demonstrating that Pierre took orders from non-TPIC individuals. Indeed, the evidence Pierre provided suggesting that Hall was another operator (and therefore not his superior) appears incomplete. The provided testimony discusses when Hall worked for Action Oil Field Services in White Castle, LA, as an operator for TPIC— seemingly as a contract hand. (*See* Deposition of Clayton Hall, Rec. Doc. 44-3, at 15:10-19). The exhibit cuts off directly following the question, "And so did you go directly from working for Action to Texas Petroleum?" (*Id.* at 15:23-25). None of Pierre's argument relates to the testimony following that question.

Finally, to the extent that Toby Trosclair, an Eagle employee, was referred to as Pierre's supervisor, the Court is not convinced that such a designation precludes a finding that Pierre was controlled by TPIC in this case. First, TPIC's Health and Safety Manager, Brandon Lege, who investigated the accident, testified that Pierre had reported the accident "to his supervisor"—referring to Trosclair of Eagle—and that Pierre had not reported the accident to TPIC because he feared termination. (Deposition of Brandon Lege, Rec. Doc. 44-8, at 26:21-27:4). The other exhibit is from Pierre's deposition, in which he referred to Trosclair as "our superintendent at Eagle," and that he reported the incident to Trosclair because he was afraid of Clayton Hall. (*See generally* Rec. Doc. 44-9). Under the general concept of the "borrowed employee" doctrine, Eagle may maintain an organizational structure through which Pierre has supervisors while he is contracted to work for TPIC. *See Melancon*, 834 F.2d at 1246 (noting that ceasing control "does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine" (citing *Capps v. N.L. Baroid-NL Indus.*, 784 F.2d 615, 617-18 (5th Cir. 1986))). Such a connection does not, on its own, suggest that Trosclair had any hand in controlling Pierre, except to receive this complaint.

In review of the facts, the Court finds that Pierre has not successfully shown that an issue of fact exists with respect to control. This factor weighs in favor of applying the borrowed employee doctrine.

B. <u>Whose Work Was Performed?</u>

The parties have agreed that TPIC's work was being performed. (Rec. Doc. 44, at 6). This factor weighs in favor applying the borrowed employee doctrine.

C. <u>Agreement or Understanding</u>

9

The parties heavily dispute the third factor—whether TPIC and Eagle had an agreement, understanding, or meeting of the minds. TPIC argues that because a contract existed, there was a meeting of the minds. In opposition, Pierre argues that many of the provisions of the MSA, listed in his argument for factor one, prevent the application of the doctrine. He also provides several exhibits in which Pierre is referred to as a contract operator or a contractor with Eagle, and TPIC's interrogatory answers in which it stated that Pierre was not an employee of TPIC. In its reply, TPIC provides a very short argument that the agreement cannot create an issue of fact. This Court disagrees with TPIC.

Several Fifth Circuit cases have handled similar factual backgrounds, including matters containing MSAs in which the relationship was defined as an independent contractor relationship. *See, e.g.*, *Alday*, 750 F.2d at 377; *Billizon*, 993 F.2d at 105-06; *West v. Kerr-McGee Corp.*, 765 F.2d 526, 531 (5th Cir. 1985). In each of these cases, the court noted that an issue of fact precluded summary judgment, or that, at the least, the third factor contained an issue of fact preventing the court from finding that it weighed in favor of applying the borrowed employee doctrine. *See Alday*, 750 F.2d at 378-79; *Billizon*, 993 F.2d at 106; *West*, 765 F.2d at 531. The Court is satisfied that the issues presented by the contract, which contains provisions suggesting that Pierre could not be considered a borrowed employee, create an issue of fact. *See Brown*, 984 F.2d at 677-78 (noting that whether the parties had an understanding to modify the contract may be a disputed factual issue (citing *Alday*, 750 F.2d at 378)). The Court lacks sufficient facts to indicate whether the contract was modified or otherwise allows for the application of this doctrine.

This factor weighs in favor of Pierre.

D. Acquiescence

The next factor to be considered is if Pierre acquiesced in the new work situation. "The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them." *Id.* at 678. TPIC argues that Pierre clearly acquiesced due to his seven-day hitches, providing little else in the way of additional argument. Pierre argues that he did not acquiesce to a borrowed employee relationship, providing as proof that he reported his accident to Eagle. While it is noteworthy that Pierre brought the issue of the accident to Eagle, this factor considers whether he was aware of his work conditions. In *Brown*, the Fifth Circuit focused on the fact that "Brown worked, slept and ate in Union's field for a month prior to his accident." *Id.* Here, Pierre's deposition shows that he worked, slept, and ate in the TPIC field for three months prior to his accident. (Deposition of James Pierre, Jr., at 16:2-18:14, 39:3-20). The Court is satisfied that Pierre acquiesced to the working conditions at TPIC.

This factor weighs in favor of applying the borrowed employee doctrine.

E. Termination of Relationship

The parties appear to agree that Eagle did not entirely terminate its relationship with Pierre, but TPIC argues that "a lending employer need not 'completely sever' its ties to the borrowed employee." (Rec. Doc. 35-2, at 11 (quoting *Melancon*, 834 F.2d at 1238)). TPIC instead asserts that the relationship was in place for Eagle to act as a payroll conduit and assist in placing him with TPIC, but nothing more. In support, it cites *Melancon* and *Capps*. In *Melancon*, the Fifth Circuit re-emphasized that this factor focuses "on the lending employer's relationship with the employee while the borrowing occurs." *Melancon*, 834 F.2d at 1246 (quoting *Capps*, 784 F.2d at 617-18). Finally, TPIC argues that where daily tasks were provided by the borrowing employer and the lending employer was unaware of the daily work performance, the relationship is terminated. (Rec. Doc. 35-2, at 11).

11

In opposition, Pierre argues that the MSA requires Eagle to maintain a safety program and safety training for its workers. (Rec. Doc. 35-8, at 3). He also cites various provisions of the TPIC Manual. The Court, having considered the evidence, finds that Eagle may still have maintained some employment relationship with Pierre. Not only was Pierre subjected to mandatory safety programs, but he also reported his injury directly to Eagle, as discussed above. The Court is hesitant to accept facts pertaining to control, an entirely separate factor in this analysis, as proof that the relationship between Pierre and Eagle was sufficiently severed.[5] Accordingly, the Court finds that an issue of fact remains as to the status of the relationship between Pierre and Eagle during his time with TPIC.

Accordingly, this factor weighs in favor of Pierre.

F.  Tools and Place for Performance

TPIC argues that Hendry's affidavit settles the issue of tools, as he states that "the tools the contract hands, such as Mr. Pierre[,] used to perform their daily activities which included wrenches, gauges, and other tools were all provided and owned by TPIC." (Rec. Doc. 35-7, at 2). Pierre concedes that the place of the performance, housing, and food were also all provided by TPIC. Instead, he argues (1) that Hendry lacks personal knowledge relating to Pierre[6] and (2) that Eagle was required to provide and maintain all personal protective equipment, materials, and instrumentalities necessary to perform work safely. (Rec. Doc. 44, at 9 (quoting TPIC Manual)). First, the Court is not convinced that the provision of PPE creates a factual issue as to this factor. Second, Pierre has provided no evidence that Eagle did, in fact, provide these tools. This Court finds that the tools were provided by TPIC.

---

[5] That is, to the extent that TPIC has introduced evidence that Eagle was uncertain of day-to-day activity of Pierre, the Court believes that such evidence, while relevant, fails to rebut evidence that Eagle remained connected for certain human resources issues.
[6] The Court has already rejected this argument.

Therefore, this factor weighs in favor of applying the borrowed servant doctrine.

G. Length of Time

Pierre worked for TPIC for nearly three months, with his first hitch beginning on July 28, 2022, and his final day being October 10, 2022. Although Pierre argues that he worked forty-two days (six hitches), the Court has considered this factor by observing the total number of calendar days working for TPIC, which adds up to two-and-one-half months. Following *Billizon*, this Court finds that amount of time "neutral." *Billizon*, 993 F.2d at 105-06 (finding "more than three months" to be a neutral factor).

H. Right to Discharge

TPIC argues that it had the right to discharge Pierre from its fields. The Fifth Circuit has, in the past, stated that "the right to terminate [the employee's] services with itself . . . is the proper focus when considering who has the right to discharge the employee." *Capps*, 784 F.2d at 618 (citing *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245 (5th Cir. 1981) (per curiam)). Interestingly, the Fifth Circuit has also recognized that such a situation could weigh against a finding of borrowed employee. *West*, 765 F.2d at 531 (noting that while Kerr-McGee could dismiss West from the platform, it could not fire him from his position with the supplying firm, and ultimately finding that there was too much conflicting evidence to grant summary judgment). The Court believes that *West* is an aberration, and notes that Pierre has conceded that this factor weighs in favor of applying the borrowed employee doctrine. The Court agrees.

This factor weighs in favor of applying the borrowed employee doctrine.

I. Obligation to Pay

The final factor to be considered is who had the obligation to pay the employee. Where an employee's time tickets are verified by the "borrowing employer" and ultimately paid by the

13

"lending employer," the procedure supports borrowed employee status. *Brown*, 984 F.2d at 679 (citing *Alexander v. Chevron, U.S.A.*, 806 F.2d 526, 528 (5th Cir. 1986)). Both affidavits provided by TPIC state that the employees would complete timesheets, which were then approved by TPIC and submitted to Eagle; Eagle would then invoice TPIC for the amount paid. (Rec. Doc. 35-6, at 2; 35-7, at 3). The Court notes that Pierre provided pay stubs from Eagle. (*See* Rec. Doc. 44-18). Additionally, the MSA dictates that TPIC provide payment to Eagle within thirty days of any invoice. (Rec. Doc. 35-8, at 4). Pierre has suggested that there is no guarantee that TPIC has, in fact, paid Eagle, nor does it "have to pay Eagle for labor services until thirty days after receipt of Eagle's invoice." (Rec. Doc. 44, at 11). However, Pierre has provided no case law that suggests that this would distinguish the facts from those considered by the Fifth Circuit in *Brown*.

Therefore, this factor weighs in favor of applying the borrowed employee doctrine.

Conclusion

The Court, having reviewed the evidence provided, is not convinced that, as a matter of law, Pierre was a borrowed employee. There has been sufficient evidence provided that creates issues of fact. Therefore, granting summary judgment would be inappropriate. *See West*, 765 F.2d at 531 (finding that control, provision of tools, and significant length of time on the platform were insufficient to apply the doctrine as a matter of law); *Brown*, 984 F.2d at 679 (finding that questions of who gave instructions about how and when to clean the platform and what the understanding was between the parties with respect to borrowed employee status precluded summary judgment). Here, the third and fifth factors both have underlying issues of fact, and the seventh factor is neutral. While *Billizon* found that summary judgment was appropriate where all factors but the third (issue of fact) and the seventh (neutral) were in favor of finding borrowed employee, the Fifth Circuit stated that the remaining factors "clearly point[ed] to borrowed-employee status." *Billizon*,

993 F.2d at 106. The Court is unwilling to make such a finding. Of course, in making this determination, the Court expresses no opinion concerning the ultimate resolution of this issue at trial.

Therefore, TPIC's motion for summary judgment is **DENIED**.

*3. Hall's Motion*

Hall's motion for summary judgment relies on the disposition of TPIC's motion in favor of designating Pierre a borrowed employee. Having found issues of fact in the evidentiary record, the Court denied TPIC's motion, thus rendering Hall's motion moot. Accordingly, Hall's motion for summary judgment is **DENIED**.

Accordingly;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 41)**, filed by Claimant, James Pierre, Jr., is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 35)**, filed by Defendant, Texas Petroleum Investment Company, is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 42)**, filed by Defendant, Clayton Hall, is **DENIED**.

September 5, 2024

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE